JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant John Judd appeals from his convictions on one count of impersonating a police officer and one count of burglary. He raises eight assignments of error that collectively challenge (1) the court's jurisdiction, (2) the quality of the evidence, (3) the admission of certain evidence and (4) his sentence. We find no prejudicial error and affirm.
 {¶ 2} The state presented evidence to show that Judd worked as a "repo" man — a person who repossessed automobiles. He had been hired to repossess a silver Pontiac Grand Prix from a man named Patrick Plicka. Plicka dated a woman named Jessie Wilce. Wilce's parents were divorced, and Jessie had at times in the preceding three years lived with her mother, although she and Plicka had, around the time Judd committed his crimes, been staying with her father.
 {¶ 3} The mother testified that around dinner time Judd knocked on the side door of her house. He told her that he had lost his dog and wondered if she had seen it. When she replied that she had not seen the dog, Judd said that he and his associate had "seen a grey car in [her] driveway with a dog in it." The mother told Judd that she "didn't know what he was talking about" and he left.
 {¶ 4} A short while later, the mother's son and his friend were at a gas station when the friend was confronted by Judd. Judd flashed what looked like a police badge and addressed the friend by saying, "hey, man, get your hand — get your *Page 4 
F'ing hands up." Judd asked him where the son was. The friend told Judd that the son was inside, paying for the gas.
 {¶ 5} The son testified that he was exiting the gas station when he heard Judd ask his friend "where is Mr. Wilce." The friend pointed to the son and Judd approached the son, "flashed the badge and told me to get my hands out of my pockets and he patted me down." Judd told the son that both Plicka and his sister Jessie had outstanding warrants for check fraud and one from child services in Portage County. The son told Judd that he did not know Jessie and Plicka's whereabouts. He called his father to inquire about them, but his father did not know. Judd asked the son to give him the father's address. The son said that his father had recently moved to a new address and that he did not know the street number.
 {¶ 6} A second Wilce daughter testified that she lived with her father. Around the same time as the events occurring to her mother and brother, she said that she received a call from someone who claimed to work at a video store. The caller made inquiries as to who was allowed to use her father's account with the video store and that there were videos that had not been timely returned.[1] Later that day, the daughter said that she saw a man, whom she identified as Judd, walk up the driveway going towards the backyard. She told her father, and he went to the door *Page 5 
to the backyard, at which time he saw Judd "running around his yard." The father opened the door and asked Judd what he was doing. Judd said that he was looking for his dog. The father told Judd to leave the yard.
 {¶ 7} The daughter testified that she spoke to her mother earlier and learned that her mother also had a man show up claiming to be looking for a dog. Believing Judd to be the same person who approached her mother, she alerted her father and then called the police. While she was on the telephone with the police, Judd entered the house so quickly that he banged the door against a shelf. In a "threatening" tone, Judd told the father that "I'm a police officer." Judd pulled a badge from his right, back pocket and "flashed" it at the father. He told the father that he was a "police officer" and that there were arrest warrants issued against Jessie and Plicka. Although the father thought it suspicious that Judd did not carry a gun or have his badge on his belt like some police do, he did not confront Judd because "I wasn't going to argue with a police officer."
 {¶ 8} Judd also mentioned that he was going to take Jessie's child "and give her to family services." At this point, the father asked to see Judd's badge again. Judge pulled a different badge from his front pocket. The badge had the words "enforcer" written on it. When the father asked what an "enforcer" did, Judd told him that he was a repo man. The father told Judd to leave. Later that same evening, Judd called the father to complain that the police had pulled his brother *Page 6 
over and broken the brother's shoulder. Judd said that once he settled with the police, "I'm coming to arrest you right after that." The father said that Judd called him afterwards to say that he repossessed the car and to thank the father for helping him get the car back.
 {¶ 9} Jessie's grandmother testified that Jessie and Jessie's daughter sometimes stayed with her. She said that she received a telephone call from a man who identified himself as "Mike Nielson."[2] The caller said that he was coming over to take Jessie's daughter. Upset over the call, the grandmother called her daughter (Jessie's mother) and asked her to come over and spend the rest of the evening with her.
 {¶ 10} Plicka's aunt testified that she received a telephone call from a man named "Mike something" who asked for Plicka. Plicka did not then live with the aunt, although he had lived with her for a brief period of time before the telephone call. As it happened, Plicka stopped by his aunt's house shortly after she received the telephone call. Plicka called the number on the caller I.D. and then left the house. "Mike" called again and asked for Plicka. The aunt told the caller that Plicka had been at her house, but left. The caller became angry upon hearing that Plicka left the aunt's house and "started screaming at me, and I asked him who he was. *Page 7 
And he told me he was a cop, and he's coming with the 6th district to arrest me for obstructing justice." The aunt replied that she lived in the Third District and hung up the telephone. She then called the police. The police used the telephone number from her caller I.D. to speak with the caller. The caller told the police that he was a bounty hunter. The police confirmed that there were no outstanding warrants against Plicka.
 {¶ 11} Plicka testified that he purchased the Grand Prix from a used car lot, but the car could not pass an emissions test. He tried to contact the dealer, but was unable to reach him. He put $425 worth of repairs into the car, but it again failed the emissions test. After more attempts to reach the dealer proved unsuccessful, Plicka called the attorney general's office to see if he could take any action under the Lemon Law. He admitted that he stopped making payments on the car at this point. He confirmed his aunt's testimony regarding the telephone call from "Mike," saying that he called a "Mike Neilson" using the number of his aunt's caller I.D. "Mike" told him that he was a private investigator and that he was working on a case involving Jessie's "two timing for check fraud." During the course of this conversation, he "got a bad vibe" and decided to leave.
 {¶ 12} Jessie testified that she had been at her grandmother's house when she received a telephone call from a "Mike Neilson." Neilson told her that he worked for the "prosecutor's division" of the Cuyahoga County Support Enforcement Agency and that it was imperative that he speak with Plicka. In further conversations *Page 8 
with Plicka, Jessie learned that Mike Neilson had told Plicka that he was a private investigator and that Jessie had been "two timing" Plicka, and that it was imperative that Plicka call Neilson.
 {¶ 13} Judd testified and confirmed many of the events testified to by the state's witnesses. He said that he ran a car repossession business called "Nationwide Recovery" and had been asked to repossess Plicka's car. He said that in the course of repossessing cars, he often gave disinformation so as to protect his true purpose — he found that people would not voluntarily give information to him. He denied telling anyone at any time that he was a police officer. He carried an "identification badge" that he used in his business. He described the badge as "a gold oval with wings. It says Nationwide Recovery on that badge."
 I {¶ 14} For his first assignment of error, Judd complains that the court lacked jurisdiction to hear the case because the judge who presided over trial was not shown to have been assigned at random as required by Loc.R. 30 of the Cuyahoga County Court of Common Pleas, General Division.
 {¶ 15} Loc.R. 30 states in relevant part:
 {¶ 16} "All cases shall be assigned to a judge by lot, upon arraignment of the defendant, in accord with Rules 4 and 36 of the Rules of Superintendence for the Courts of Ohio. There will be a random assignment of cases to judges through an *Page 9 
objective and impartial system that ensures the equitable distribution of cases among the judges."
 {¶ 17} The court's docket shows that the judge who was originally assigned to hear the case was removed "for good cause shown."[3] The case was reassigned and transferred to the docket of a new judge. The court's docket does not indicate whether the newly assigned judge had been selected by lot, as required by Loc.R. 30. Judd did not object at any time to the reassignment.
 {¶ 18} In In re J.J., 111 Ohio St.3d 205, 2006-Ohio-5484, the supreme court recently considered an analogous issue of whether a juvenile division magistrate's transfer of a case to a visiting judge rendered a judgment by the visiting judge void ab initio or merely voidable. The supreme court distinguished between a court's subject matter jurisdiction and procedural irregularities, holding at paragraph one of the syllabus that: *Page 10 
 {¶ 19} "In a court that possesses subject-matter jurisdiction, procedural irregularities in the transfer of a case to a visiting judge affect the court's jurisdiction over the particular case and render the judgment voidable, not void."
 {¶ 20} The court concluded that a failure to object to the transfer order at the time it had been made resulted in the error not being preserved and thus waived for appeal. Id. at T|16.
 {¶ 21} In the present case, it is undeniable that the court had subject matter jurisdiction over these criminal proceedings. Even if we assume without deciding that the reassignment of the case to another judge had been made in violation of Loc.R. 30, that failure would only have rendered the court's subsequent judgment voidable. As in In reJ.J., Judd's failure to object waived the matter for purposes of appeal.
 II {¶ 22} For his second assignment of error, Judd complains that the court erred by denying his motion to appoint a special prosecutor. He maintains that the Cuyahoga County Prosecuting Attorney could not fairly prosecute the case against him after there had been allegations that prior to trial he rammed his car into a car driven by one of the assistant prosecuting attorneys assigned to handle the case.
 {¶ 23} During the same pretrial during which allegations detailed in fn.1, supra, were raised, the state told the court that one of the assistant prosecuting attorneys assigned to the case had been driving home from work when a red pickup truck *Page 11 
crossed three lanes of traffic, pulled behind the prosecuting attorney and rammed her vehicle three times. The state discovered that Judd had a red pickup truck registered in his name. Judd's attorney told the court that Judd had nothing to do with the incident, noting that the pickup truck that had been found in Judd's backyard "was crushed and broke in half and demolished months ago. They didn't tell this Court that. He doesn't own any red pickup truck."
 {¶ 24} Judd's newly retained counsel filed a motion for a special prosecutor, suggesting that "under the circumstances detailed herein, including, any ongoing investigation into the assault of [the assistant prosecuting attorney involved in the highway incident], the ability of the Cuyahoga County Prosecutor's Office to fairly prosecute this matter has been compromised."
 {¶ 25} R.C. 2941.63 states:
 {¶ 26} "The court of common pleas, or the court of appeals, whenever it is of the opinion that the public interest requires it, may appoint an attorney to assist the prosecuting attorney in the trial of a case pending in such court. The board of county commissioners shall pay said assistant to the prosecuting attorney such compensation for his services as the court approves."
 {¶ 27} Because the statute is written using the discretionary term "may," we review the court's decision for an abuse of discretion. An abuse of discretion implies *Page 12 
that the court's actions were "unreasonable, arbitrary or unconscionable." See State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 28} The statute does not define the term "public interest." Black's Law Dictionary defines the term as "something in which the public, the community at large, has some pecuniary interest, or some interest by which their legal rights or liabilities are affected. It does not mean anything so narrow as mere curiosity, or as the interests of the particular localities, which may be affected by the matters in question." In State ex rel. Ross v. Guion (App. 1959), 82 Ohio Law.Abs. 1, 9, this court adopted that same definition.
 {¶ 29} We find no public interest involved that was so compelling as to require the court to appoint a special prosecutor. The interest involved did not affect the community at large except in the aspirational sense that the prosecuting attorney's office be compelled to conform to its ethical duty to fairly prosecute cases.[4] The prosecuting attorney's office had a duty to begin an investigation into the incident, as the allegations made by the assistant prosecuting attorney whose car had been struck could arguably support charges for, among other things, vehicular assault and *Page 13 
obstruction of justice. The investigation of the incident would not necessarily call into question the fairness of the prosecuting attorney's office in handling the case.
 {¶ 30} Judd's argument would appear to suggest that even though this incident happened to a single assistant prosecuting attorney, the entire staff would have to be disqualified and replaced by a special prosecutor. This is an untenable proposition because any incident involving a member of the prosecuting attorney's office would, under his reasoning, result in the de facto disqualification of the entire prosecuting attorney's office. We conclude that the court did not abuse its discretion by denying Judd's motion for the appointment of a special prosecutor.
 {¶ 31} We likewise note that Judd suffered no prejudice from the court's refusal to grant his motion. The assistant prosecuting attorney who reported the hit and run tactics of the red pickup did not participate at trial. Moreover, there was no mention at trial of this incident, so it could not have tainted the jury. Judd has thus failed to show any prejudice.
 III {¶ 32} Judd next argues that there was insufficient evidence to prove either the burglary or impersonating a police officer counts.
 A *Page 14 {¶ 33} When reviewing a claim that there is insufficient evidence to support a conviction, we view the evidence in a light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 B {¶ 34} The indictment charged Judd with impersonating a police officer, in violation of R.C. 2921.51(E). That section states that "[n]o person shall commit a felony while impersonating a peace officer, private police officer, a federal law enforcement officer, officer, agent, or employee of the state, or investigator of the bureau of criminal identification and investigation." The word "impersonate" means "to act the part of, assume the identity of, wear the uniform or any part of the uniform of, or display the identification of a particular person or of a member of a class of persons with purpose to make another person believe that the actor is that particular person or is a member of that class of persons." See R.C. 2921.51(A)(3).
 {¶ 35} The evidence showed that at the gas station, Judd not only flashed a police badge to the son, but he then proceeded to pat down the son. These are actions which only a police officer would ordinarily perform. Moreover, Judd told the father that "I'm a police officer" and flashed what appeared to be a police badge. Despite his reservations about Judd's failure to carry a gun, the father believed that Judd was a police officer, saying that he complied with Judd's orders because "I *Page 15 
wasn't going to argue with a police officer." Finally, the aunt testified that a caller who was later identified as Judd "started screaming at me, and I asked him who he was. And he told me he was a cop, and he's coming with the 6th district to arrest me for obstructing justice." Again, the evidence showed that Judd identified himself as a police officer with the purpose of making the aunt believe that he was, in fact, a police officer.
 {¶ 36} Judd argues that he was acting with a lawful purpose as he was doing his job as a repo man and thus established an affirmative defense under R.C. 2921.51(F). That section states that "[i]t is an affirmative defense to a charge under division (B) of this section that the impersonation of the peace officer, private police officer, or investigator of the bureau of criminal identification and investigation was for a lawful purpose." R.C. 2921.51(B) states that "[n]o person shall impersonate a peace officer, private police officer, or investigator of the bureau of criminal identification and investigation, or a federal law enforcement officer."
 {¶ 37} Judd's argument relating to the affirmative defense is without merit because the plain language of R.C. 2921.51(F) shows that the affirmative defense only applies to defendants charged under R.C.2921.51(B). It is a fundamental principle of statutory construction that the expression of one or more items of a class implies that those not identified are to be excluded. Thomas v. Freeman (1997),79 Ohio St.3d 221, 224-225 (expressio unius est exclusio alterius). The specificity of R.C. 2921.51(F) clearly excludes its application to any other subsection of R.C. *Page 16 2921.51. The state charged Judd with violating R.C. 2921.51(E), so the affirmative defense does not apply.
 {¶ 38} Even if we were to consider Judd's assertion of the affirmative defense, we would find that he failed to carry his burden of proving by a preponderance of the evidence that he acted with a lawful purpose by impersonating a police officer. R.C. 2901.05(A).
 {¶ 39} Although Judd testified that his job could sometimes cause him to confront persons who were unwilling to have their vehicles repossessed, personal convenience alone is not a lawful purpose under R.C. 2921.51(F). Even though Judd was acting lawfully by repossessing cars, that fact did not mean that he had a lawful purpose in identifying himself as a police officer. In State v. Dubose, Mahoning App. Nos. 02-CA-227 and 02-CA-231, 2004-Ohio-4284, the Seventh Appellate District Court of Appeals held that a security officer at a drinking establishment, while lawfully engaging in the job of security officer, had failed to prove the affirmative defenses under R.C. 2921.51(F) because she failed to prove that she was lawfully trained and licensed by the state. Id. at ¶ 65-66. Similarly, in State v. Forgac, Mahoning App. No. 02-CA-57, 2003-Ohio-4462, the state charged Forgac, a uniformed security guard, with impersonating a police officer after he pointed a gun at a group of people who had been shouting and identified himself as a police officer. The court of appeals rejected an assertion of the affirmative defense, stating: *Page 17 
 {¶ 40} "Appellant did not demonstrate by a preponderance of the evidence that he impersonated a peace officer for a lawful purpose. While he may have acted with a lawful purpose in stopping to check out what he believed were screams for help, he had no right to wave a gun around and point it at the residents on the porch and to represent himself as the police. Furthermore, appellant testified he told the police officers that he was a Youngstown Police Officer with all of the authority they had. There was no lawful purpose for representing himself this way to the officers. Thus, appellant did not prove his affirmative defense by a preponderance of the evidence."
 {¶ 41} Judd offered no evidence to show how his impersonation of a police officer had been for a lawful purpose. We therefore find that a rational trier of fact could, having viewed the evidence in a light most favorable to the state, conclude that Judd displayed the identification and played the part of a police officer with the purpose to make another person believe that he was a police officer.
 C {¶ 42} The indictment also charged Judd with committing burglary, in violation of R.C. 2911.12(A)(3). That section states that "no person, by force or stealth or deception, shall * * * [trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense * * *." *Page 18 
 {¶ 43} The evidence showed that Judd, unannounced, pushed his way into the father's house, throwing the door open with such force that it banged against a shelf behind the door. He then flashed a badge and said that he was a police officer. A reasonable trier of fact could conclude that these facts show that he committed a trespass by entering the house using force, and then committed the offense of impersonating a police officer by flashing the badge and threatening to arrest Jessie. We therefore conclude that the evidence supported the jury's conviction on the burglary charge.
 IV {¶ 44} In his fourth assignment of error, Judd argues that the convictions on both counts were against the manifest weight of the evidence. He does not separately argue this assignment, however, stating only that:
 {¶ 45} "Here, the jury simply lost its way as to the convictions. The evidence is lacking that Appellant is guilty of the crimes charged herein. Certainly the jury was tainted against someone who had an unpleasant job to do. Also, the `bad acts' evidence[5] certainly tended to cast Appellant in a bad light. However, as stated in Assignment of Error I [sic], there is not the requisite evidence for a conviction."
 {¶ 46} This argument does not satisfy Judd's App.R. 16(A)(7) obligation to give "reasons in support of the contentions, with citations to the authorities, statutes, and *Page 19 
parts of the record on which appellant relies." Likewise, Judd has the obligation under App.R. 12(A)(2) to separately argue each assignment of error. The quoted portion of this assignment of error fails under both rules. We therefore disregard this assignment of error.
 V {¶ 47} The fifth assignment of error is that the court erred by allowing prejudicial other acts testimony by four suburban police officers to the effect that Judd had, in prior repossessions, flashed a badge and identified himself as a police officer.[6] He argues that this evidence was irrelevant and caused unfair prejudice to him.
 {¶ 48} Under Evid.R. 404(B), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." The rule prohibits the introduction of other acts because there is the danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crimes charged in the indictment. State v. Cotton (1996), 113 Ohio App.3d 125, 131. *Page 20 
 {¶ 49} Although other acts evidence is inadmissible to prove the character of a person in order to show that he acted in conformity therewith, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evid.R. 404(B). Even though other acts evidence might be admissible for this purpose, it must still be relevant under Evid.R. 402. Moreover, other acts evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. See Evid.R. 403(A). As with all other evidentiary issues at trial, the admission or exclusion of evidence rests within the sound discretion of the trial court. State v. Jacks (1989), 63 Ohio App.3d 200, 207.
 {¶ 50} The court admitted testimony from a police detective who stated that the police department "received several phone calls" from Judd and Judd's business partner in the month leading up to trial. The detective identified the telephone from which those calls were made as being a cell phone registered to Judd. This number corresponded to the number that appeared on the aunt's caller I.D. when Judd called her house and asked to speak with Plicka. The state played for the jury a voicemail from a telephone number matching Judd's in which a caller stated:
 {¶ 51} "This is Michael Nelson. My telephone number is * * *. I'm calling regarding a case. The defendant is John W. Judd. I don't have the case number in front of me, but if you could call me back and let me know in regards to the case, who is handling the case, I would appreciate it. Thank you." *Page 21 
 {¶ 52} The detective said that he was familiar with Judd's voice and that it was Judd's voice on the voicemail.
 {¶ 53} The court did not abuse its discretion by admitting this evidence under Evid.R. 404(B). It is questionable whether the voicemail constituted a crime, wrong, or act within the purpose of the rule. The state offered the voicemail to identify Judd's voice and, by inference, Judd's use of the alias "Mike Nelson." Nothing in this testimony could reasonably be considered to suggest that Judd's voicemail had been improper. The court admitted the voicemail for the purpose of identifying the voice. We see no abuse of discretion in this ruling.
 VI {¶ 54} The sixth assignment of error complains that the court permitted the state to elicit testimony from a police officer about Judd's post-arrest silence.
 {¶ 55} The Fifth Amendment to the United States Constitution states: "No person * * * shall be compelled in any criminal case to be a witness against himself * * *." In Miranda v. Arizona (1966), 384 U.S. 436, 468, fn.37, the United States Supreme Court stated that "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that [the defendant] stood mute or claimed his privilege in the face of accusation."
 {¶ 56} In Doyle v. Ohio (1976), 426 U.S. 610, 618, the United States Supreme Court explained that the Miranda warnings convey an implied assurance to the *Page 22 
accused that the state will not use a defendant's silence against him at trial. "Doyle rests on `the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'" Wainwright v. Greenfield (1986), 474 U.S. 284, 291, quotingSouth Dakota v. Neville (1983), 459 U.S. 553, 565. "Such comments penalize a defendant for choosing to exercise a constitutional right. Prosecutors must therefore take care not to equate the defendant's silence to guilt." State v. Thompson (1987), 33 Ohio St.3d 1, 4.
 {¶ 57} Judd did not object to any of these statements at the time they were made by the detective, so we review them for plain error. InState v. Frazier, 115 Ohio St.3d 139, 2007-Ohio-5048, at 4|206-207, the supreme court recently stated the standard of review to be employed in cases in which plain error is invoked:
 {¶ 58} "[T]he test for plain error is stringent. A party claiming plain error must show that (1) an error occurred, (2) the error was obvious, and (3) the error affected the outcome of the trial. SeeState v. Barnes (2002), 94 Ohio St.3d 21, 27, 2002 Ohio 68,759 N.E.2d 1240; United States v. Olano (1993), 507 U.S. 725, 732, 113 S.Ct. 1770,123 L.Ed.2d 508; Crim.R. 52(B); see, also, Washington v. Recuenco
(2006), 548 U.S., 126 S.Ct. 2546, 2553, 165 L.Ed.2d 466
(Blakely error is not a `structural error' and is subject to harmless-error analysis).
 {¶ 59} "The burden of demonstrating plain error is on the party asserting it. See, e.g., State v. Jester (1987), 32 Ohio St.3d 147, 150,512 N.E.2d 962 (`appellant *Page 23 
cannot claim that the trial court's instruction was plain error, inasmuch as he cannot demonstrate that but for the error, the outcome of the trial would have been different'). Additionally, `[n]otice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'State v. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus."
 {¶ 60} The events leading to Judd's arrest occurred on December 2, 2005. The detective testified that the case had been assigned to him on December 5, 2005. He said that a great deal of work had been accomplished by the time he was assigned the file — the officer had filed reports and obtained witness statements. At that point, the detective prepared a photo array to show to the father and daughter. When both the father and daughter identified Judd from the photo array, the detective considered the investigation to be complete. On December 6, 2005, he consulted with the state to inquire whether the matter was ready for submission to the grand jury. With this testimony before the jury, the detective was asked if he attempted "to get ahold of Judd. The detective replied, "I didn't because I was-my chief had given me information that he had spoken with Mr. Judd and/or his attorney and he wasn't interested in talking to him — talking to us. I actually would have liked to have talked to Mr. Judd."
 {¶ 61} As of December 6, 2005, there was no evidence that Judd had been arrested. An officer who responded to a call on December 2, 2005, testified that he *Page 24 
and other police units stopped Judd and his partner, William Hale,[7]
and spoke to them, but released them upon learning that they were repo men. Hale disputed the officer's account of the stop, claiming that he and Judd had been roughly handled by the officers and that he had been handcuffed when officers discovered he possessed a pocket knife. He agreed, however, that he and Judd had not been taken to the police station and booked. Hale testified that after this stop, on some indeterminate date but during the month of December 2005, he, Judd and their attorney spoke to the police chief to complain about the heavy-handed treatment the police allegedly employed when they stopped him and Judd on December 2, 2005.
 {¶ 62} We find no error of any kind, much less plain error, in the detective's testimony. The testimony showed that as of December 5, 2005, Judd had not been arrested and thus no Miranda warnings were required or had to be given; hence, there could be no "post-arrest" silence subject to comment. The detective merely expressed his desire to speak with Judd as part of his investigation. This statement did not constitute a comment on Judd's desire to exercise his right to remain silent. Likewise, Judd offered no evidence to show that the detective's statement that the police chief had spoken with Judd in the presence of counsel and that Judd was not interested in speaking to the chief preceded any arrest. In any event, Judd had counsel present during the meeting with the chief and there is no indication that Judd *Page 25 
or his counsel asserted his right to remain silent at that meeting. At all events, Judd's right to remain silent remained intact, and the detective's statement did not constitute a comment on Judd's post-arrest silence.
 VII {¶ 63} Finally, Judd argues that the court erred by sentencing him to maximum, consecutive sentences for burglary and impersonating a police officer. He argues that R.C. 2929.14(E)(4) [consecutive sentences] and R.C. 2929.14(C) [maximum sentences] both require the court to make "appropriate" or "proper" findings before imposing those sentences.
 {¶ 64} In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, the supreme court severed R.C. 2929.14(C) and (E)(4) from the sentencing statutes as they were unconstitutional because they required judicial factfinding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of the defendant. Id. at paragraphs one and three of the syllabus.
 {¶ 65} Judd acknowledges Foster, but argues that Foster offends principles of ex post facto and due process because it changed the punishment set forth in R.C. Chapter 2929 and permits courts to impose greater sentences than the statutes originally permitted. We rejected this argument in State v. Mallette, Cuyahoga App. No. 87984,2007-Ohio-715, and incorporate that decision here. See State v.Dowell, Cuyahoga App. No. 88864, 2007-Ohio-5534.
 Judgment affirmed. *Page 26 
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MELODY J. STEWART, JUDGE
MARY EILEEN KILBANE, P.J., CONCURS
ANN DYKE, J., CONCURS IN JUDGMENT ONLY
[1] The son testified that he learned of the telephone call from the video store and that when Judd confronted him at the gas station, Judd referenced that call, "laughed and pointed to himself and said that was me, that was me."
[2] The trial transcript shows several different spellings of the name used by Judd: "Nielson," "Neilson," and "Nelson." It is unclear whether these were separate aliases used by Judd, or just differences in pronounciation that were recorded verbatim by the court reporter.
[3] The transcript shows that the originally-assigned judge had issued a capias against Judd because Judd had failed to appear in court as required by the terms of his bond. In a hearing on Judd's request for a writ of habeas corpus, the judge noted that she issued the capias after receiving information from the state that a caller from a telephone number assigned to Judd represented himself as a supervisor in the prosecutor's office and requested information about the case. The judge detailed a similar incident in which a caller who claimed to be an FBI agent called the judge's bailiff and asked for details about Judd's case. The judge recalled the capias, recused herself from the case and granted defense counsel's motion to withdraw from the case.
[4] Canon 7 of the Ohio Code of Professional Responsibility provides that "a lawyer should represent a client zealously within the bounds of the law." In this context, Disciplinary Rule 7-103 (A) prohibits a public prosecutor from "instituting] or causing] to be instituted criminal charges when he knows or it is obvious that the charges are not supported by probable cause." A prosecutor has a duty "to seek justice, not merely to convict," and "should use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute[.]" EC 7-13 (responsibility of public prosecutor).
[5] Judd's fifth assignment of error, which raises the issue of bad acts evidence under Evid.R. 404(B), will be addressed infra.
[6] In violation of App.R. 16(A)(7), Judd does not detail any express statements made by these officers. He only makes the single, vague assertion, without a reference to the trial transcript, that a detective testified that Judd called the police station using different names.
[7] Hale accompanied Judd on December 2, 2005, but remained in the car during all events. *Page 1